Good morning. May it please the Court, Darren Morris on behalf of Mr. Ceja Gomez. Counsel for Mr. Rubio-Perez and I have agreed to a ten-minute, five-minute split. Meet with ten minutes. Would the clerk divide it up that way, please? I'd like to reserve three for—I'd like to reserve three. Obviously, the colloquy in this case deviated markedly from the requirements of Rule 11 in a number of respects. The government essentially is offering up two, I think, strained arguments to excuse those errors. The first— The thing that concerned me was if I understand the facts right, Ceja Gomez did not move to withdraw his guilty plea. And if I understand the law right, when there's no motion to withdraw the guilty plea, use the plain error standard. So Ceja Gomez has to prove that his substantial rights were affected. That's correct, Your Honor. And I don't see where he did. Well, Your Honor, there are three ways in which— I think substantial rights means I wouldn't have pleaded had, I don't know, the Rule 11 colloquy been properly translated or had I been told the one or two things I wasn't told, that sort of thing. I think there's two issues with the plain error analysis. First is whether he was prejudiced, and also then there's the issue of reasonable probability standard. And I do want to redirect this Court's attention to footnote 10 of the Dominguez-Benitez opinion. The reasonable probability of a different decision rule should not apply to a case where the plea is not voluntary. And Dominguez-Benitez, it's important to remember, was a case that only involved a Rule 11 violation. The defendant in Dominguez-Benitez had not been told that he couldn't withdraw his plea if the Court didn't accept the government's recommendation. And the colloquy rendered a voluntary plea in all other respects. Another interesting case to note is U.S. v. Adams, which was decided after Dominguez-Benitez by this Court, in which the defendant was not informed about a mandatory minimum fine of $400,000. The Court in that case found that the failure to advise the defendant about a mandatory minimum fine rendered the plea involuntary. And the Dominguez-Benitez case is never mentioned by this Court in Adams because it had no application. Once the plea is determined to be involuntary, that's it, and the Court doesn't undertake the probability of a reasonable probability of a different decision analysis. The Court doesn't look to, well, how strong was the evidence? Because if the plea is involuntary, then the conviction needs to be reversed, and this Court shouldn't substitute its evaluation of the evidence where there's no voluntary plea. So while I agree that the standard here is plain error, reasonable probability of a different outcome should not be incorporated into that standard. Even if it is, I think there are differences here between Dominguez-Benitez and Ceja Gomez's case. First of all, Dominguez-Benitez said repeatedly, I don't want a trial. There's no way I want a trial. I'm not going to trial. That was said over and over again. Here we have a case where Mr. Ceja Gomez voiced his surprise at sentencing. What do you mean I'm not getting nine years? The deal was for nine years. And this Court, even if it were to apply the reasonable probability of a different outcome standard, shouldn't put itself in the position of second-guessing the wisdom of Mr. Ceja Gomez's decision or determining that he's foolish. Ceja Gomez got 180 months, right? He did, Your Honor. And that was his deal? His deal was that he, his deal was a cooperation agreement with the government's position to be determined later and that his attorney would be able to ask for as little as nine years, which is what his attorney did. So his guideline range was 262 to 327 months? That calculation actually was an error. His guideline range was actually a bit higher than that, quite a bit higher. I believe it was correctly calculated. It was 420 months to life. There was a mistake. The parties agreed. There was a mistake in the written plea agreement, and the parties agreed to use part of what was in the written plea agreement of 262 to 327 months as the applicable guideline range. So his guideline range was 420 to life and he got 180? That's correct, Your Honor. And we're supposed to think he wouldn't have pleaded if only he'd been told, I can't remember exactly what. If he'd been informed of the applicable penalties, which were a 15-year mandatory minimum, and a 420 to life standard range. And his plea is involuntary because he wasn't told that. Well, there are a few things that make his plea involuntary. It seems ridiculous on its face. Anybody who's looking at 420 to life guidelines and has a chance for 180, grab it and run. Well, Your Honor, I think it's important to remember that Mr. Ceja Gomez was very obviously intending to ask for nine years and really thought that he either was going to get nine years or stood a reasonable chance of getting nine years. And for his plea to be voluntary and for his request to be informed, he needs to know what the applicable penalties are. He needs to know how far below 420 months to life is nine years. Where was this 108 months to nine years? Where is that discussed? That is discussed in the plea colloquy. Mr. Ceja Gomez asks a question about it, and Mr. Ceja Gomez is told that your attorney will be able to ask for nine years and that the strength of your cooperation may affect the strength of that request. So Mr. Ceja Gomez should have known all the time. He's told he doesn't have a deal for the nine years? He is specifically told. He's also a person with no formal education at all who had obvious problems understanding the colloquy. He says in the plea colloquy, I want nine years, and the judge says your lawyer will be able to argue for nine years, but you don't have a deal for nine years. You may get more. That's correct. He's told that. He's not told what the mandatory minimum is, 15 years. His request isn't put in any kind of context. I think the lack of information about the guidelines and the mandatory minimum penalties promoted his confusion because he didn't have a reference. Additionally, there's the issue about whether he was informed of the charges correctly in the first place, and there's this colloquy where the court essentially lays out the elements of conspiracy correctly. It says, and you intended to foster one of the pieces of the conspiracy. Probably the court should have said object of the conspiracy, but essentially that was a correct statement. Do you understand, Ceja Gomez says, right, because I used it. And then the court follows up and says, and you understand that that's what the government would have to prove. Now, the government is arguing that the court simply brushed Mr. Ceja Gomez's attempt to minimize his culpability aside and that that was appropriate, but the court's obligation during the colloquy was to canvas Mr. Ceja Gomez's understanding with the utmost solicitude, and that's the language of Boykin. To canvas Mr. Ceja Gomez's understanding, knowing that he had this very low level of education, the court's obligation was not to brush Mr. Ceja Gomez's concern aside, and that's what the court did. The court also fundamentally misconstrued the confrontation right when it told Mr. Ceja Gomez that he could challenge the evidence rather than confront the witnesses against him, and that encapsulation of the confrontation right was very clearly rejected recently in the Melendez-Diaz decision by the Supreme Court, which said that the right of compulsory process is in no way the same as the confrontation right. So those errors combined did render Mr. Ceja Gomez's plea involuntary. I'll reserve my remaining time. Thank you. Thank you, counsel. May it please the court, I'm Charles Johnson. I represent Mr. Francisco Rubio Perez. I'm not going to take a lot of the court's time here. I think if the court read the transcripts from both the hearings we had regarding the withdrawal of his plea and the safety valve issue, I think the court could see that Mr. Rubio Perez was confused, wasn't aware of what was going on throughout these proceedings. I found that when you deal with Hispanic defendants who have very little education, and certainly not an education that compares to anything that we kind of take for granted here in the United States, and who has never been in trouble before, never been inside of a courtroom, never dealt with attorneys, certainly not defense attorneys, you have to be very careful how you say things to your client because they take things very literal. And there's no question in my mind that Mr. Brennan was attempting to do his best for his client. You know, I don't know if we can assume that he didn't understand. He could also be a clever fellow who uses being Hispanic to pretend to not understand. That certainly is a possibility. That happens all the time. You are dealing with somebody in an arm's-length relationship, and they understand you fine as long as you're paying the money and they want to sell the goods, and then when you want to return them or change something, they don't understand. I don't disagree with you, but all I can do is say, read the transcript. I think the judge thought he was a liar. The judge said you and the truth bump into each other only by accident. Obviously, that's why we're here, because I don't agree with the judge. And I know it's a tough burden to prove that the judge abuses discretion here, but I think if you read the totality of the circumstances of the transcript. Help me on the timing. Motions to withdraw pleas come at various times. Sometimes they come the next day. Sometimes they come after sentencing. Frequently they come after the pre-sentence report is issued, because the defendant sees that the sentence is going to be harsher than he had expected. When did it come in this case? Well, it was interesting, because, first of all, after the plea, Mr. Rubio-Perez wanted another attorney. So that took some time for me to be appointed. And then I actually filed a motion to withdraw. When? What had happened? Had the pre-sentence report come out? Well, sure. So it was after the pre-sentence report. Oh, sure. And then, Your Honor, we actually went to the courthouse. We were in court for sentencing, and he changed his mind. He said, I don't want to withdraw my guilty plea. And then after subsequent conversations with him, he informed me that he did, and I filed another motion to withdraw. So I think that was at least – I'm not sure if that was at least nine months after his plea or the hearing to withdraw the plea was nine months after. But it was some – there was some period of time. But, again, I can't impress upon this Court more than I think how carefully you have to be when you talk to these individuals, because they take everything literally. And I think when Mr. Brennan told them, hey, you need to take a sample of your voice so that we have something to take into court to show that that was not you on those taped phones. If Cihad Gomez is as smart and dishonest as the judge thought he was, he was resisting the voice exemplar because, although his attorney might not know it, he knew full well it was his voice. That could be. But, you know, I'll give you an example. I had a case once, and Judge Martinez here, a district court judge in this district, acted as a settlement judge. I mean, the judge said explicitly he didn't find Rubio naive or stupid, but clever in the extreme. And you're asking us basically to make a contrary fact finding. Well, I'm asking you to take a look at the totality of the circumstances. And I'm asking you to understand how careful you have to be when you talk to these people, because they take everything literally, because they're not – number one, they lack the education. Number two, he's never been in a courtroom before. He's never been in a situation where he talked to defense attorneys. And as a defense attorney, sometimes we kind of fall into patterns, I guess. Is there any expert testimony in this record about these people and about how careful you must be? I shouldn't say these people. I should say Hispanic defense. I'm not worried about that, about these defendants, and that, indeed, he does fall within that particular category. No expert testimony. Just what you're telling us. Only the testimony from my client when he was on the stand explaining the relationship with his attorney and how it evolved into the point where he actually pled guilty. I mean this general need for care. Pardon me? This general need for care. There's nothing on that if you're just telling us, right? Well, I'm telling you based upon the transcripts and his response to my questions during the hearing where we were trying to withdraw his plea. Okay, thank you. I think it's relatively clear. But, Your Honor, just in answering your question, Judge, the settlement conference, I just want to finish this story real quick. Judge Martinez, well-respected judge here, Hispanic, speaks to the clients in Spanish, so there's no interpreters telling me what they're talking about, interpreting Spanish to English for me. I had a client once that wouldn't sign a document even though he told the judge, You are a judge. I respect you. I trust you. I understand what you're telling me. But he wouldn't sign a document that the judge basically told him it was in his best interest to sign so we could get a continuance on a trial date. And we found out that the reason he wouldn't sign it was because of the little village he came from in Mexico, his parish minister, his parish priest, Catholic priest said, Don't ever sign a document without me taking a look at it first. So that's kind of what you're dealing with here. That wasn't Rubio, right? No, it wasn't Rubio. Thank you, counsel. So when you have a situation where an attorney says, Hey, if you don't take this thing, I have nothing to work with. I can't really defend you. I think we understand the general argument. Okay. Thank you, counsel. Thank you. May it please the court, my name is Matthew Diggs and I represent the government in this consolidated appeal. I'll first address the arguments of Defendant Ceja Gomez. Defendant Ceja Gomez argues that errors in the magistrate judge's Rule 11 colloquy amount to plain error, which require reversal because his substantial rights were affected. Not exactly. He agrees that it's a plain error standard. He agrees that he has to show a probability that his substantial rights were affected. But he says that under Adams, if he's not correctly informed of the mandatory minimum, then his plea is automatically deemed involuntary and his substantial rights to have been affected. Could you respond to that? Your Honor, the government suggests that that's not a fair reading of Adams. At Adams, Rule 11 was at issue. And in fact, the last line of the court's decision at Adams refers to the standard whether, had the defendant in that case been properly informed, the court could have made the determination that he would not have pled guilty. That's the standard taken straight from Dominguez Benitez, even though that case isn't directly cited in Adams. Here, we're clearly within the Rule 11 plain error review. It's not a Boykin issue. At Adams, I didn't read Adams before coming to the argument. Does Adams hold, does it reverse? It does, Your Honor, because the defendant- Why does it reverse? Because the defendant was not made aware of the fines, and based on the entire record in that case- And how do we distinguish it? Your Honor, we distinguish this case for a number of reasons. To begin with, this defendant was made aware of the mandatory minimum penalties at arraignment. The mandatory minimum penalties were clear in the written plea agreement, which the defendant testified under oath had been read to him and which he understood. That's what the record shows. Then we look at what a reasonable probability is of what this defendant had done. In Adams, the fine was not in the written plea agreement? I can't say for sure, Your Honor. I know the court did take issue to the fact that it was never mentioned at the plea colloquy. We hear during the plea colloquy the judge confirmed that the defendant had read the plea agreement. But even if there is error, and the government admits that there is error not to review the mandatory minimums here, to suggest that this defendant would not have pled guilty had he known there was a- Does Adams say it's automatic, that it's an automatic, involuntary plea? No, Your Honor. No, the last line in Adams is that based on the record before the court, the court could not find that the defendant would- What about the other lines? Right, would have pled guilty. What about the other lines in Adams? What was the reasoning? I'm not sure I understand your question. Well, never mind it then. No point answering it then. In terms of the mandatory minimums, they were- You just told me the last line of Adams. Those are never any use because it just sort of sums up what the result is so the clerk knows what to put in the mandate. What I wanted to know was about the reasoning in Adams so that we can determine whether it's distinguishable. The reasoning in Adams is that the whole issue for that defendant was a- was the agreement in the plea between the government and defense that he would not be subject to a fine. Then the sentencing judge looks at the sentencing guidelines and realizes there is a mandatory minimum fine in this case so the defendant says, well, I had no idea. I never would have pled guilty. The whole issue for me to plead guilty was to avoid this fine. That's simply not the record we have in this case. In this case- On Adams, the whole point of the deal was to avoid the fine? My reading of Adams is that the defendant's whole interest in the deal was the government's agreement that he would avoid the fine. Here where the mandatory minimums admittedly were not read, it is a really strained argument to believe that had they been read in this case, that the defendant would not have pled guilty, that he would have gone to trial facing mandatory minimums of approximately, the way the government figures it, 50 years. Or a sentencing guideline range, which your Honor recognized to be 420 months to life. To suggest that facing those kind of penalties, this defendant wouldn't have pled guilty, really strains credibility. There are other errors in the Rule 11 colloquy suggested by defense counsel, but the point the government makes is even if all of those are in fact errors, and we don't concede that they all are, even if they're all errors, we're in the plain error of substantial rights review that the Supreme Court set out in Dominguez Benitez. Even if those- There are, except for the articulation that the defendant has made, it's not simply a Rule 11 problem, but it vitiates the knowing and voluntary nature of the plea. The footnote in Dominguez Benitez does say it's a different case if you have an objection based on whether the plea was knowing and voluntary. And although it may not have been fleshed out very much, I do hear defendants, I do read defendants' brief as making that argument, and so that argument's out there. If in fact that is the issue being pressed, the footnote appears to say it's a different ballgame. We don't in that case go back and re-evaluate whether or not the defendant would have bled out. Certainly there could be such circumstances where it would be a different ballgame, but the case that's cited by the Supreme Court for those circumstances is Boykin v. Alabama. That's a case where the record showed no evidence, and the Supreme Court is clear where there's no evidence that the defendant is informed as to what he's pleading guilty to and the rights he's waiving. That case is decided on due process grounds, and really we've got a constitutional floor for the defendant to suggest here that where there's a written plea agreement, the defendant is represented by counsel, acknowledges on the record that he's had the plea agreement read to him and understands it. And there is a significant Rule 11 colloquy. It may not meet the gold standard, but it is substantial to suggest that even two or three Rule 11 errors turn this case into one of a constitutional dimension really doesn't find support in the case law of this circuit or anything else that I was able to come up with. In Boykin, just to follow up on your question, the Supreme Court said that it would not find a knowing and voluntary plea from a silent record. Here what we have is quite a leap from a silent record, I would suggest. With the remainder of my time, unless there are further questions on Mr. Ceja Gomez, I'll turn to the argument of Mr. Rubio Perez. Mr. Rubio Perez argues that Judge Layton abused his discretion by denying his motion to withdraw a plea. Here Mr. Rubio's fair and just reason for his motion to withdraw his plea is really twofold. One, ineffective assistance of counsel, and two, that he was so confused at the plea colloquy that he didn't understand what he was pleading to. The issue of ineffective assistance of counsel is fairly dealt with at the evidentiary hearing where Judge Layton certainly reasonably found that Phil Brennan was more credible than the defendant, Rubio Perez. Second, with regard to whether Rubio Perez was so confused at the plea colloquy, it's the government's position that Judge Layton was correct to credit Mr. Rubio Perez's statements under oath during the plea colloquy to a greater degree than his arguments afterwards at the motion to withdraw his plea. The timeline, I think, tells us a lot about Mr. Rubio Perez's motives here. His plea was accepted by the district court on November 30, 2007, and he switched counsel in early December of 2007. His motion to withdraw his plea did not come until April 2008. He then, at the evidentiary hearing for that first motion to withdraw his plea, withdrew that motion when he understood he would be likely to face 80 months. Pre-sentence report comes out. All of a sudden, he realizes he has to give a safety valve proffer, may not be getting the 80 months. He refiles the motion to withdraw his plea, and now we're about nine months after he effectively entered the plea. The court, I believe, can look at his change of hearts. You're saying, let's see, the first motion to withdraw his plea was before the pre-sentence report, and the second one was after? No, I misspoke, Your Honor. The pre-sentence report that I have is dated January 2, 2008, so even the first motion to withdraw his plea was after the pre-sentence report. Oh, so you just misspoke on that? Yes, I did, Your Honor. I'm sorry. And the pre-sentence report said he's going to have to snitch out his codefendant in order to get the deal that he'd hoped for? Well, the pre-sentence report made clear what his guideline range was, which without the safety valve was 135 to 168 months, with a mandatory minimum of 120 months that he wasn't going to be able to be In closing, with regard to Mr. Rubio-Perez, the truthful safety valve proffer means you're going to have to snitch somebody out in order to get below that number? Well, it means you're going to have to honestly and truthfully discuss the circumstances of the offense or offenses to which you're charged. So it's okay if you just chat about it honestly, but when you're asked the name, you refuse? No, that's not it. I don't know quite why. I asked you what I thought was a straightforward, easy question, and you avoided it, and I thought, I must be misunderstanding something. Why would he avoid that? No, he has to talk about the nature and circumstances of his offense truthfully. He might not have someone to snitch out. Everybody in the circle has already known to the government. He just has to lay out everything he knows. Absolutely, and which he failed to do. I think that's clear from the record. Seeing no further questions, the government would ask the court to affirm the convictions of both defendants. Thank you. Thank you, counsel. Briefly, Your Honor, there are some distinctions between Mr. Ceja Gomez's case and the Adams case, obviously, which the court will observe. But the key point about Adams is that what the court didn't do is take a look at what the evidence would have been if Adams had gone to trial. The court didn't. I just looked at your brief again because I was surprised I had missed this whole thing, and I didn't see where this argument from Adams was made. I cited Adams in my brief, Your Honor, but I didn't lay it out. The court's correct. I didn't lay it out as much as I'm laying it out today because it didn't strike me until shortly before this argument that Adams is a post-Dominguez Benitez case, and that's really the key about Adams. The court in Adams was fully aware of the Supreme Court's invitation in Dominguez Benitez to do this sort of evidence about how strong the evidence was and whether the defendant could reasonably have prevailed at trial. Adams looked at a case where the defendant was not apprised of the mandatory minimum, and there was no effort to undertake that analysis. No judge in the Adams case was talking about whether Mr. Adams would have won or lost and whether he would have been subject to this mandatory fine anyway. The analysis stopped at the voluntariness of the plea. In terms of whether, even if the reasonable probability standard is applied, and understanding that Mr. Ceja Gomez got nine years instead of some really stiff penalties, there are some questions I think that should be asked about what is reasonably probable. If Mr. Ceja Gomez had understood fully what the government was required to prove in terms of a conspiracy, not simply that he used drugs, understood who the witnesses were who the government would have to call into court, and had understood that the nine-year request that he was making, he had understood how far that was from the applicable penalties and the 15-year mandatory minimum, would he have made a different decision? There are a lot of defendants who feel that a certain amount of time, even when they're facing mountains of time, that a certain amount is just too much. Would Ceja Gomez have felt that 15 is just too much? Nine I can do, 15 I can't. Would he have made a different decision? And this is where the Supreme Court's language about not second-guessing a defendant, the wisdom of a defendant's decision, really comes into play. And that's exactly what happened at the sentencing. The sentencing court said, look, 15 is the mandatory minimum. That's already quite generous. And Ceja Gomez was not informed about how that would play in the court's analysis. I'm not hearing much from the government about the written plea agreement, but I would like to just briefly highlight that issue. Time has expired. Time has expired. Thank you, Your Honor. Thank you, counsel. Thank you, counsel. United States v. Ceja Gomez and Rubio Perez is submitted, and we're adjourned for the morning.
judges: Fernandez, Kleinfeld, Clifton